Let's proceed to the second case, Giles v. Godinez. Mr. Info. Thank you, Your Honors, and may it please the Court. Plaintiff's appellant Bruce Giles suffers from a number of serious and debilitating mental illnesses, including anxiety, depression, and schizoaffective disorder, which causes him to experience hallucinations and suicidal thoughts. When Mr. Giles is being consistently treated for these conditions, the symptoms attendant to his mental illnesses abate to a very significant extent, allowing him to live a relatively normal life. During the period of time at issue in this lawsuit, Mr. Giles was not being consistently treated for those conditions. Due to a series of transfers between Illinois Department of Corrections facilities and attendant failure by the defendants to ensure that his medical records, including prescriptions, followed him through those transfers, Mr. Giles experienced a significant decline in his mental health. This exhibited in the form of changes in his behavior, resulted in an altercation with another inmate, and ultimately put him into segregation, where his mental health declined to an even greater extent. What kind of treatment is he getting over these transfers, which seems to be part of the problem? Yes, that's right, Your Honor. So the transfers caused him to receive treatment, both counseling and, perhaps more importantly, medication, only intermittently. So during the period, which is 2011 and 2012, it begins in 2010. He's being shifted around between different Illinois Department of Corrections facilities, and when these transfers happen, he goes off his medication, goes back on his medication, and he's then filing grievances with the defendants, pointing out that this is causing him distress, it's causing his symptoms to come back. He also points out in those grievances that when he's being placed in segregation, following the altercation, that the segregation itself is also causing his symptoms to become exacerbated. What did the wardens know? So knowledge is a really important point in this case. The only evidence in the record as to the knowledge of any of the defendants are two things. The first thing are the grievances that Mr. Giles submitted to the defendants, they're addressed to the defendants. Depending on which facility he's being housed in, it names the warden, assistant warden, the head of the counseling department, depending on what it is precisely he's complaining about. The only evidence on summary judgment that the defendants put in in opposition to those grievances is a single affidavit. It's only from one of the defendants, defendant Godinez, who was at that time in charge of the entire Illinois Department of Corrections system. And that affidavit, which is not exactly clear, but it appeared to have been prepared in a different case, but it doesn't make any specific averments about what defendant Godinez knew about Mr. Giles' conditions, his grievances. It simply says, I don't generally, as a part of my work as the head of the Illinois DOC, review inmate grievances. None of the other defendants put in an affidavit. So there's really no, other than the grievances themselves, no evidence in the record about precisely what it is that they knew. Okay. I'm just looking at the treatment he did get from various people. It seemed to be, once they got tuned in, they prescribed medicine and they did other things. And he referred to Dixon, I believe. Is that another prison? Dixon is one of the facilities he was housed at. Is that one that has, it seemed to be he liked Dixon for some reason.  Dixon, Your Honor, has more treatment available for mentally ill inmates. Although that's not, he received more treatment at Dixon. That's certainly the case. It's not in the record that Dixon has more treatment available for mentally ill inmates, but he received more treatment. But apparently they have limited beds. That's correct, yes. And so he couldn't get in there whenever he wanted to. It wasn't a facility. Well, it just seemed that there's certain, it would be better if he were constantly getting these two or three medications. But the transfers seemed to infer with that. That's right, Your Honor. The doctors didn't follow him. That's right. So he had to encounter new doctors as he got to the other places. That's right, Your Honor. And I'd point out that, and this is an important issue in the case, obviously, that we haven't alleged claims against the medical practitioners who were responsible for his care. The prescriptions that they wrote, the counseling that they prescribed for him, as you know, seemed to improve his condition when he was receiving those prescriptions and that treatment. It's rather that the defendants, as non-medical prison administrators, interposed themselves between Mr. Giles and that care, both through the transfers, his placement into segregation, and the rest of the conduct that we've put in our briefing. I want to go back to the knowledge issue. As you have correctly noted for your Eighth Amendment claim, these non-medical defendants had to have known and intentionally disregarded or disregarded an excessive risk. So their knowledge is significant to each of your Eighth Amendment claims. There are nine different defendants here from three different institutions, and all of them are non-medical. And you're relying correctly, tell me if I'm correct or not, please, you're relying on the grievances and the fact that your client sent grievances to establish their knowledge? That's right. There's no other evidence in the record related to their knowledge. And I'm sorry. And certainly as to Warden Berkey, there is evidence that he received and signed at least one of them. But what evidence do you have? Let's start with Illinois River. What evidence do you have that Jackson or Lemke either received or read or acknowledged any of the grievances or even that they were addressed to Jackson or Lemke? I didn't see in the record that any of these particular grievances were addressed to those two. So that's correct, Your Honor. We don't actually have any indication in the record specifically that those defendants received the grievances. So what's your evidence then? If your only evidence of knowledge is the grievances and no evidence that those particular defendants received the grievances, how do you create an issue of fact on knowledge? So I'd respond to that in two ways. First, it's inferential evidence. There's no doubt. We would have to be asking the jury to say he was housed at this facility and he sent grievances to the prison administration at this facility detailing his problems with his mental illness and his failure to receive treatment. And we're asking you, the jury, to infer that the defendants here received that knowledge. There's no way around it. This is not a perfect record, and we certainly would not be entitled, if Mr. Giles had moved for judgment, to receive judgment on this record. I'm sorry. I'm sorry, I didn't mean to interrupt you. Go ahead. No, the second piece of my response, though, Your Honor, would simply be that all that the defendants would have had to do to entitle themselves to summary judgment on this record is put in an affidavit saying, I've never heard of this guy. I've never seen these grievances. But your client has to come forward with some evidence, and especially for the ones who I've identified, although there are other ones as well. Pfister, Pontiac, these other non-medical defendants who would not have been exposed to his medical records, who would not have dealt with medical issues on a regular basis, these other non-medical defendants, you have to have some evidence to suggest that you can prove knowledge. And are you telling me your only evidence is the fact of their positions being an assistant warden or warden or clinical services supervisor, that just by the fact of their position, they likely saw the grievances and therefore were on notice? So I think that absent any other evidence in the record, which there is none, that inference is sufficient to get Mr. Giles' past summary judgment. And that question, the sort of underlying question of their knowledge, would be answered at trial. They'd be asked to testify at trial, did you see these grievances? Unfortunately, we don't have depositions from them that would answer those questions at this point. Was there any evidence in the record as to what the procedure was for grievances at any of these three institutions? So the only deposition testimony is from Mr. Giles himself, and he had some notion about what the grievance procedures were at these various facilities, although, I mean, it's obviously as an inmate. But no, although I will note that the grievance procedure was one of the records that Mr. Giles requested in his document request that he submitted to the defendants that they didn't respond to. Well, it certainly, though, if there is such a thing, of someone in the administration of each prison, I learned a long time ago I would not know how to run a prison. But I assume there would be maybe someone who oversees grievances, and that may be a person that would be a possible defendant at each prison, but it would be a different person at each prison, not the warden. I mean, the warden, we talk about grievances, they don't deal with that every day, I guess. And that's why I'm wondering if that was something that you found, that there is a person in each prison that oversees how grievances are being handled, because the grievances are all over the place. You're already writing about something. And so they pile up, and there are various ways they deal with them. And each prisoner thinks it's not very good. That's the trouble with this case, as Judge St. Evans pointed out, that all the defendants are non-medical, and you end up with guessing at what this grievance is about and who got it and who knows about it. Maybe that's what you were hoping to do on discovery and then start digging in and maybe line up some more defendants. I think that's right, Your Honor. What we would do were this case to be remanded to the district court is undertake the sort of discovery you would ordinarily expect in a federal district court, which is we would take the depositions of these defendants, we'd get some documents, we'd figure out who ultimately is responsible for the grievance procedure, and we would, depending on what we found in the medical records, potentially add some different defendants. The real issue here is simply that because Mr. Jobs was pro se and because he was unable to get the defendants to respond to discovery, there's just not really a sufficient record here to answer some of the, I think, important questions in the case. And I'd like to have better answers for you on some of those points, and I think that if given the opportunity to take discovery, we would have answers to those questions. Well, as far as appointing counsel and other things, it's like the judge did make an effort to find somebody. I don't know. He had contacted 50 lawyers, is that correct? That's right, Your Honor. And nobody raised their hands and said, yeah, we'll help. I don't know how people make that determination. But at least he gave it a try. Yes, Your Honor, he did indeed. And I'm not trying to fault the district judge too severely here. This is a very difficult situation. There's a lot more pro se litigants than there are people who are able to represent them in court on a pro bono basis. I think there's two aspects of it. First, if the case is remanded and nobody raises their hand, myself and my firm would be happy to represent him in the district court on remand. And second, that at least in terms of the case law that we cite related to the appointment of counsel, the one distinguishing feature between this circumstance and the Hayes case would simply be that the district court took one more step, which is to delay entering summary judgment on behalf of the defendants until it had tried one more time to try and recruit counsel. Here, given that the record is almost exclusively documents that the defendants attached to their briefing on summary judgment, to me that's a red flag that there hasn't been adequate discovery in the case, that the only deposition is Mr. Jowell's deposition. He's asking in his motions to the court for assistance in part so that he can conduct the discovery. I think one more shot would have been something that ought to have happened here. Mr. Imfeld, you also have a conditions of confinement claim. It wasn't crystal clear. Is the basis of your claim the placement in segregation, or is it a combination of segregation and the infestation, or is it just the infestation? Could you please clarify for me the scope of what your conditions of confinement claim is? Yes, Your Honor. The initial conditions of confinement claim focuses a lot on the vermin infestation in the pro se filings that Mr. Jowell put in below and in his initial briefing to this court before appointed counsel took it on. The real issue, after discussing it with the clients and digging into the record, is that Mr. Jowell was being put in segregation under the circumstances we're describing, where he's only inconsistently being medicated and where he's not receiving treatment on a regular basis. He's being placed in segregation under those circumstances, and that what's happening to his mental health while he's in segregation is the conditions of confinement violation. So there's case law out there dating back nearly 20 years at this point indicating that in appropriate circumstances where the impact of segregation is significant enough on the inmate who's being placed in segregation, particularly where there's mental illness at issue, that that can rise to the level of an Eighth Amendment violation, and that's the crux of my argument. Is there evidence as to what his conditions of segregation were? Unfortunately, no. We don't have direct evidence about it, and we don't know how it changed from facility to facility, except to say that at Dixon, I have a chart here of when he was in segregation and which facilities, but I don't believe there's any segregation, that Mr. Jowell was never placed in segregation at Dixon. That was my next question, because I couldn't tell which facilities and for how long he was in segregation. And that's unfortunately not entirely clear on the record. Even from his deposition, it isn't clear. We lined up his deposition testimony and his grievances, and the two periods of segregation appear to be the second half of his stay at Illinois River, which would have been starting at the end of March of 2011 and extending to some point in his stay at Pontiac, sometime in July of 2011. The second stay is all at Lawrence, and that's in 2012 from February until November. That's as best we can gather from the record, but those don't quote me on those dates. Segregation from February to November? Correct. Now, is there any issue about segregation being for his protection as opposed to punishment? The only indication in the record is that he was placed in segregation because, at least for the initial placement in segregation, was due to an altercation with another inmate. That altercation resulted from his being unmedicated and hallucinating, and he was talking to himself, and another inmate took offense at that. Well, that's for his own protection. That's why maybe we don't know anything about that. That's a long time for segregation, unless if he's in the general population or something that he's in big trouble. Yeah, and it's not clear on this record whether it's for his protection or as a penological decision or not. Both of those decisions, I would note, would be administrative decisions and not medical decisions. And the defendants do point out in their brief, and I would touch on it briefly, that there is some indication in the record that there are segregation reviews taking place, that sometimes medical staff would determine and they would put something in his medical file, and the quote is that continued segregation placement is not contraindicated. And that only, to my understanding, only happens twice, and unfortunately we don't know who made that determination. The signatures are redacted, but the two instances, which are both in 2011, one at the end of April and one at the end of July, they're typewritten, unlike the rest of the notes, which are handwritten. They're bookended by entries from the actual psychiatrist who's treating Mr. Giles. His signature is not redacted. So I just don't know how much emphasis to put on the idea that the defendants want to indicate from these two documents that somehow the medical staff had signed off on his segregation placements and said it wasn't harming him. As we note in our brief, there's some differing opinions about what exactly the medical staff was saying about this, and that these two documents, we're not sure who signed them, whether the people were actually medical staff. Well, he was getting treated, though. I'm sorry? He was getting treated and getting medication while he was in segregation. That's correct, yes. Want to save a little time? I would, Your Honor. Thank you. Okay. May it please the Court, I'm Assistant Attorney General Linda Boachianza on behalf of defendants. Mr. Giles has been diagnosed with a serious mental health condition, and according to the Mayo Clinic's website and other publicly available information, there is no cure for his condition. Instead, it has to be managed by a combination of medications and therapy. That's exactly what Giles received from the mental health professionals at Illinois River Pontiac and Lawrence. For example, Giles' mental health treatment plan from Lawrence is on page 335 of the record. The mental health staff marked that Giles would be provided with individual therapy, and we know from page 339 of the record that he was given a combination of psychotropic medications. In this lawsuit for damages under Section 1983, Giles chose not to sue the medical professionals who were actually treating him. Instead, he claims that the department's director, the wardens and assistant wardens at these three facilities, and two other administrative personnel were deliberately indifferent to his serious medical condition and subjected him to unconstitutional conditions of confinement. In cases like Rascho v. Elie and Berry v. Peterman and many others, this court has authorized non-medical officials to rely on the expertise of the medical professionals regarding an inmate's treatment. The record demonstrates that Giles received consistent treatment from the mental health staff at each facility and to the extent that he had mental health-related issues, the medical officials resolved them without the need to escalate to the warden, let alone to the acting director. Go ahead. Was the medical treatment consistent with each facility, or were they different doctors and different people coming up with something? It would seem if someone has got prescriptions for certain medication for certain things, that would sort of follow him from one place to another. And if it's a new doctor and everything else, they would see that as soon as he, I guess, files one of his grievances or whatever else he did to say he wasn't getting enough treatment. As I understand the issue with, so the court referenced earlier that there was some difficulty in his being transferred. And as I understand the record, the transfer summary is supposed to indicate what medications he's being given at the prior facility. That's completed by the medical staff because the initials LPN are next to the person's signature on the transfer summary. In terms of it being consistent, also as I understand the record, the medications are adjusted based on his reporting of what particular combination is working for him or not working for him. So, for example, there are times where he has told, it's in the record where he told mental health professionals that, oh, I don't like this combination. It's aggravating my symptoms. And so they would adjust maybe by swapping out one medication instead of another. So it's sort of a fluid process as I understand it. And that's not an indication that he's being mistreated in any way. It's an indication that they're being responsive to concerns that he's raising about his treatment. There does appear to be some periods of time though where he's not receiving his medications and he should have been. Yes, that's correct, Your Honor. So the transfer summary in each case should have listed he's receiving these medications so that when he gets to the next facility, they'll be restarted with no delay. It looks like when he was transferred from Dixon to Illinois River, the transfer summary didn't include any psychotropic medications. None of them were listed. And so there was a period where, you know, he wasn't receiving medications. But as soon as he reported to a nurse that he needed those medications, he was put back on them. So, yes, there were, and those are certainly not ideal, but there were times where the transfer summary didn't operate in the way that it should have. But that really doesn't have anything to do with these particular defendants that he chose to sue. So the record makes very clear that he was receiving consistent treatment throughout. For example, on page 342, during a session with one of the mental health professionals on October 14th of 2011, Giles told her that he was having issues with his current cellmate that he thought were aggravating his symptoms. She spoke with the placement office, and he was reselled with a different offender the following day. On page 319 of the record, Giles told a mental health professional that he hadn't received one of the medications. Her progress notes from a few days later indicate his relief at being back on the medications. So there's a question of knowledge, and there's no evidence that the department's director or any of the assistant wardens had awareness of his mental health condition or his concerns about his care. But even for the defendants that arguably were aware, the medical records make very clear that he was properly treated, and there's nothing that would put these non-medical officials on notice that they were required to intervene. Where is he now? Now? I think he's back at Dixon. That's where he wants to be? Yes. That seems to be almost need a prescription to go there. That's right, Your Honor. A psychiatrist has to approve a request to be placed at Dixon, and the record in this case shows that I think it was in early 2014 someone did approve of his being transferred there, and so he was sent there. And Your Honor was asking earlier about are conditions better at Dixon. I think the answer is yes. I think that inmates are given access to art classes and other things that probably do help with their condition. Do they have solitary confinement at Dixon? I don't know about that, Your Honor, and I don't think he was placed in solitary confinement at any point. What was he complaining about? He was complaining about segregation. Okay, I shouldn't mix those terms up then. Right. Okay, segregation means you get a cell by yourself? Not in all cases because it looks like in segregation at one point in one of the facilities he was complaining about a cellmate, which suggests that he wasn't by himself, but it isn't entirely clear kind of what the conditions in segregation were. In Johnson v. Doty, this court ruled that a non-medical official cannot be found deliberately indifferent simply because he didn't respond to the medical complaints of a prisoner who was being treated by the prison doctor. And that's essentially what Giles is asking for here. He's asking for these non-medical defendants to be found deliberately indifferent because they didn't respond directly to his concerns about his medications. But Birx v. Ramesh makes clear that a layperson's failure to tell the medical staff how to do their job is not deliberate indifference. And given the number of decisions holding that non-medical officials generally are not responsible for weighing in on an inmate's treatment, defendants were also entitled to qualified immunity on Giles' claim about deliberate indifference. Summary judgment was also proper on his claim about the conditions of his confinement. As I understand it, Giles essentially argues that because he's mentally ill, his placement in segregation violates the Eighth Amendment. But that claim overlooks the fact that mental health staff at each facility examined him while he was in segregation and they determined that it was appropriate to house him there. That's at pages 320 and 323 of the record, 325 through 329 of the record, and 351 through 54 of the record. There may be others, but for certain, they're there. So even if these non-medical defendants were aware that Giles wanted to be removed from segregation, they would have had no basis for overturning the mental health staff's conclusion that it was appropriate to house him in segregation. Giles also suggests that vermin in the facility made the conditions inhumane, but this court in Doherty v. Page observed that the inmate had to present evidence that the warden and other officials were specifically aware of the particular conditions forming the basis of the inmate's Eighth Amendment claim and there was none in this case. Qualified immunity also protected defendants on Giles' claim about the conditions of his confinement. In his reply, Giles asserts that under established law, the cumulative effects of segregation can amount to a constitutional violation. That's not a defined enough rule to put every reasonable prison official on notice that under these circumstances, their conduct would be unlawful. Again, he was housed in segregation with the mental health staff's knowledge and approval and they were providing him with medications and evaluating his condition throughout. Under these circumstances, defendants would not have known it was unlawful to allow him to remain in segregation. On appeal, Giles references defendants' quote-unquote failure to participate in discovery. I spoke with trial counsel and he couldn't independently recall what happened in this case, but after reviewing his records, counsel reports that he didn't receive any discovery requests from Giles. So I'm aware that counsel has attached them to his appendix on appeal, but trial counsel didn't get them. To the extent that Giles felt defendants were not participating in discovery, the time to remedy that issue was before the district court. Giles never told the district court that he had sent discovery requests to defendants and that they had not responded. Instead, his motions reference his inability to conduct depositions of defendants, which is common for indigent prisoners. His motion also talks about, I believe certain documents were taken from his cell at Dixon, but none of that is what he's claiming on appeal, which is that defendants failed to respond to his requests. He shouldn't be allowed on appeal to fault the district court and defendants for an issue that he never raised with them. Regarding the court's discretionary decisions, it wasn't fundamentally wrong for the court to decide, after having made several requests on Giles' behalf for more than a year, that the case should be allowed to move forward. There's no right to counsel in federal civil litigation, and this court recently confirmed in Wilborn v. Ely that the district court doesn't have an indefinite commitment to search until a volunteer is found. The court asked the lawyers in the district who had indicated a willingness to take on cases for indigent litigants. That's a reasonable step for the court to have taken. Maybe there are others that it could have done, but that doesn't mean it was an abuse of discretion. Finally, the court did not abuse its discretion in denying Giles' motion to appoint an expert. His claims in this case depended on these non-medical defendants' knowledge and action, not on any specialized knowledge about his mental health condition or his treatment, and it was well within the court's discretion to find that it could resolve his claims without expert testimony. So unless this court has further questions, we would ask that you affirm the grant of summary judgment. Thank you. Just a few points on rebuttal, Your Honors. We touched on much of the substance of our deliberate indifference and conditions of confinement arguments in my opening. I would simply note in response to what counsel has raised that the claims that Giles has brought against these non-medical defendants don't relate to the exercise of medical judgment. Moving an inmate from one facility to another, the transfer of paperwork attendant to that, placement of someone into confinement, those are administrative or penological decisions, not medical judgments. To the extent that they are trying to rely on the medical records to claim that they are insulated from liability, it's difficult to determine on this record whether they should be allowed to do that because, of course, there's no indication they ever talked to the doctors that were treating Giles in response to his grievances. There's no indication they reviewed any medical records. There's no indication that they confirmed any of the things that counsel would have you believe from the medical records that were put into the record below. With respect to the discovery, I'm sorry, with respect to qualified immunity, we've pointed to case law in our briefing that we think clearly establishes both that a non-medical prison official is on notice, that they cannot interfere with the treatment of an inmate, and that when their conduct does that, they can be held liable for deliberate indifference. This court held that as long ago as 1983. And on conditions of confinement, again, in our opening brief, we did note this is a developing area of law, but there are cases, Ruiz is one, Jones L. from the Western District, different to a certain extent facts, but certainly establishing more specifically than counsel stated that placing a mentally ill inmate into a segregation setting where they're suffering harm and you're aware of that harm can subject you to liability for a violation of the Eighth Amendment. What is a segregation? Because I probably mixed it up thinking it was solitary. But is segregation just in a certain part of the prison, or is it a specific cell assignment? Unfortunately, that's another hole in our record, Your Honor. It's not clear what segregation means. It's not even clear that segregation means the same thing at different facilities. But certainly it's a different placement than placement in the ordinary prison population. There's restrictions on movement. Based on what Mr. Giles put into his grievances, it sounds like there's restrictions on your access to yard time and other sorts of activities that inmates in the general population are able to participate in. And that segues nicely to just saying that the discovery issue in this case was placed in front of the district court in the sense that the district court was put on notice three different times that Mr. Giles was having substantial difficulty navigating the discovery issues without counsel. And I will freely admit, Mr. Giles attached the discovery requests that we attached to our briefing to his brief in this court. It's not in the district court record. And we, as a result, point to it but don't rely on it. It's simply the three motions that he brought requesting counsel that we focus on for purposes of discovery. And since she brought up the point of an expert, it's absolutely the case that in order to state a claim here, we have to show knowledge on the part of the defendants and it's specific to them. The reason the expert issue is salient, at least in my view, is because the district court appears to have concluded in the magistrate judge's report and recommendation and also the district court's order adopting, that they seem to have concluded that what happened to Mr. Giles didn't do him any harm. And that seems to be a topic that would be helpful to have an expert's opinion on. Thank you, Your Honors. Thanks to both counsel. Mr. Rimfeld, you have the additional thanks of the court for accepting this appointment and so ably representing Mr. Giles. All right. Case is taken under advisement.